KUTTROFF, PICKHARDT & CO., INC. v. UNITED STATES (No. 3601)[1]

United States Court of Customs and Patent Appeals, January 2, 1934

*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellant. *Charles D. Lawrence*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, and *Ralph Folks*, special attorneys, of counsel), for the United States.

[Oral argument October 3, 1933, by Mr. Carter and Mr. Folks]

GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellant has appealed here from a judgment of the United States Customs Court, First Division, one judge dissenting, which overruled appellant's four protests against the classification of certain automobile body paints under paragraph 28 of the Tariff Act of 1922.

In the protests, appellant claimed that the merchandise was dutiable under paragraph 68 as a paint, or under one of several other paragraphs not necessary to consider here. In view of our conclusion and of the contentions of the parties to this suit, it will

only be necessary for us to consider and quote the applicable provisions of said paragraph 28 which are as follows:

[a] PAR. 28. * * * synthetic phenolic resin and *all resinlike products prepared from phenol, cresol, phthalic anhydride,* coumarone, indene, or from any other article or material provided for in paragraph 27 or 1549, all of these products whether in a solid, semisolid, or liquid condition;

\* \* \* \* \* \* \*

[b] *all of the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1549;*

\* \* \* \* \* \* \*

[c] *and all mixtures, including solutions, consisting in whole or in part of any of the articles or materials provided for in this paragraph,* excepting mixtures of synthetic odoriferous or aromatic chemicals, * * *. (Letters in brackets and italics ours.)

It is not contended by the importer that the importation is dutiable in any of the paragraphs claimed unless it is not described or provided for in said paragraph 28.

The imported merchandise is called "Primer surfacer gray" and "Primer surfacer white", and is in the form of thin, irregular-sized pieces or sheets of a somewhat waxy and rather heavy material. The paints differ only in color which is due to the coloring pigments added. The components entering into the imported merchandise are as follows:

*Primer surfacer gray*

| | Parts | | Parts |
|---|---|---|---|
| Ground slate | 21. 8 | Plasticizer | 9. 1 |
| Lithopone | 21. 8 | Synthetic resin | 9. 1 |
| Talcum | 29. 1 | Nitrocellulose | 9. 1 |

*Primer surfacer white*

| | Parts | | Parts |
|---|---|---|---|
| Titanium white | 43. 6 | Synthetic resin | 9. 1 |
| Talcum | 29. 1 | Nitrocellulose | 9. 1 |
| Plasticizer | 9. 1 | | |

The above components, according to the record, are put into a kneading mill and kneaded for a period of three hours. The kneading mill has two arms revolving in each direction, and during the kneading process the temperature in the mill rises 30 degrees although the mill is cooled with water. After kneading, the mass is passed three times through a roller mill in which there are two steel rollers placed very close together. The mass is then converted into a film between 2 and 3 millimeters in thickness. It is then in a sticky state, and is put on wooden trays and exposed to the air for a period of eight hours, where it hardens to the extent that it can be cut up into small pieces. It is then put on wooden trays and dried at a temperature of about 50 degrees centigrade for a period of 3 days.

Either in briefs or in oral argument, the Government contends that the merchandise is described in three parts of said paragraph 28: [a] A resinlike product prepared from phenol or phthalic anhydride; [b] a product "provided for in this paragraph" (a resinlike product), derived from phenol or phthalic anhydride, "provided for in paragraph 27"; [c] a mixture consisting in part of the above resinlike product provided for in paragraph 28. The Government's counsel, in this court, suggested that the merchandise was also described and dutiable (if not dutiable under paragraph 28) in paragraph 27 of the same act, by virtue of the provision therein contained for "phthalic acid" and "phthalic anhydride", and the qualifying provisions found later in the paragraph. It is also claimed by the Government that the evidence shows that the plasticizer, which was one of the components of the merchandise at bar, contained phthalic anhydride.

The importer contends that the merchandise is not dutiable under [a] for the reason that it is not a synthetic phenolic resin and because it is not a resinlike product; that the resin component of the paint at bar is not a resinlike product, because it is a resin itself (importer's attorneys call the component "cyclohexanone resin" and "a synthetic resin"); that the provision [b] does not apply because the component resin is not one of the foregoing products (not a resinlike product); and that it is not provided for under [c] as a mixture or a solution because it is a chemical compound. The importer further argues that even if the component resin were regarded as a resinlike product, it is not "prepared" from phenol or any of the other named materials, and that if it is regarded as a resinlike product, it is not "obtained, derived, or manufactured in whole or in part" from any of the products provided for in paragraph 27.

The record is long and most of the testimony is given up to a consideration of whether the component resin can be said to be "prepared from phenol", as that term is understood by chemists, and whether the importation is or is not a "mixture". The witnesses testified that the resin is made from cyclohexanone, that cyclohexanone is made from cyclohexanol, and that cyclohexanol is made from phenol. The crux of appellant's argument on this phase of the case is that the component resin is a definite chemical compound two stages removed from phenol, and, therefore, is not "prepared from" phenol within the ordinary meaning of the phrase. The testimony of the five chemists who testified differs widely as to the meaning of the term "prepared from." This testimony is set out and discussed at great length in the majority opinion by Judge McClelland, and the opinion passes upon the weight of the evidence as is hereinafter indicated. While we do not disagree with the trial court as to its conclusions concerning the evidence, we do not feel called upon to

set it out here or discuss it at length, since evidence of this character is not necessarily binding upon the court in determining the meaning of the term. Such testimony, however, under circumstances like those at bar, is helpful. This is especially true in this case where there is so little helpful authority to be obtained from any other source.

Hans Schauder, the inventor and originator of the imported material, stated, in his testimony, in substance, that, by hydrating phenol, cyclohexanol is made, and that by dehydrating cyclohexanol, cyclohexanone is made, and that the synthetic resin at bar was made from cyclohexanone. He testified that cyclohexanol is chemically different from cyclohexanone, and that both are chemically different from phenol. These facts are not disputed.

Samples of phenol, cyclohexanol, and cyclohexanone, and the imported merchandise, were presented in evidence. Illustrative Exhibit D, representing phenol, shows it to consist of numerous, small crystals resembling rock candy, slightly pinkish in color and having a moist characteristic. The cyclohexanol, Illustrative Exhibit C, is a clear, white, sirupy liquid. The cyclohexanone, Illustrative Exhibit B, is also a liquid, slightly amber in color, and slightly less viscous than the cyclohexanol.

Another of importer's witnesses, Dr. Carleton Ellis, testified as to certain laboratory steps employed in making a synthetic resin from cyclohexanone. The process is stated in technical chemical terms and a detailed statement of all such terms is not regarded as important here. He stated that in producing synthetic resins from cyclohexanone, two methods may be used: One is the treatment of cyclohexanone with formaldehyde, and the other is a process known as polymerization "which is building up that cyclohexanone by a process of combination with itself, like laying up bricks in a wall, to make from a lower molecular structure a very large one, having the resin quality." He explained that polymerization is a chemical change resulting in producing a product chemically different from the cyclohexanone.

As we understand the opinion of the court below, the majority opinion holds that the merchandise at bar, paint, was prepared from phenol. The court said:

It is also established by a like preponderance of the evidence that the merchandise in issue was prepared from phenol through processes of manufacture that produced in turn cyclohexanol and cyclohexanone, the production of each of these being a necessary intermediate step in the preparation of synthetic resin from phenol.

It is also established by a like preponderance of the evidence that the terms "prepared from" and "derived from", as used in paragraph 28, *supra*, are practically synonymous and have the same meaning to chemists, such meaning being that both terms relate back to the parent substance from which an article is produced.

The trial court, in holding that the merchandise was provided for and dutiable under the quoted provisions of said paragraph 28, we think, reached the right conclusion. In reaching this conclusion we will approach the question from a somewhat different angle from that of the Government, in its argument, or the trial court, in its decision. As we view it, before the merchandise can be dutiable under paragraph 28 by virtue of the quoted language, it must be a "mixture" or a "solution", and the mixture or solution must consist, in whole or in part, of an article or a material provided for in the paragraph. We will first consider whether or not the importation is a mixture, and then consider whether or not the mixture consists in whole or in part of a resinlike product prepared from phenol or phthalic anhydride.

We do not think that Congress, by the use of the term "mixture" meant to use the term in the narrow and restricted sense contended for by the importer. It is true that some of the dictionary definitions of a "mixture" distinguish the term "mixture" from the terms "combination" and "compound", but this is not important here. The record here does not support the conclusion that when the synthetic resin which had been prepared from phenol in the manner described was mixed with the other components to form the paint at bar, anything more than a mixture resulted, as that term is generally understood. Whatever may be said concerning chemical reactions taking place in the process of preparing the component synthetic resin from phenol, is not important in determining whether or not mixing of the resin with the other components formed a "mixture." The mere fact that heat was generated in the mixing mill, as we view it, does not change the situation.

The Century Dictionary and Cyclopedia defines "mixture" as "state of being mixed", and "That which results from mixing; a mixed mass, body or assemblage; a compound or combination of different ingredients, parts, or principles, * * *." See *Birn & Wachenheim* v. *Dupont Cellophane Co.*, 17 C.C.P.A. (Customs) 122, T.D. 43454, and cases therein cited.

It is not disputed that the mixture at bar *consists* in whole or in part of what is called a synthetic resin. We think this resin, a resinlike product, is, by the steps hereinbefore set out, "prepared from" phenol or phthalic anhydride. It is true that in order for the mixture to consist of any of the articles or materials provided for in paragraph 28, as far as the issue is here concerned, it must consist of either a synthetic phenolic resin or a resinlike product prepared from phenol, or phthalic anhydride. The record conclusively shows that the component synthetic resin is not a synthetic phenolic resin. The

component resin in the mixture is frequently referred to in the record as a synthetic resin. Dr. Edward R. Miller, a Government witness, produced at the trial Exhibit M which he took from a sample of the imported merchandise by a process of extraction. He termed it a "synthetic resinlike product" without giving it a definite name. It seems to us that the resin or resinlike product which was prepared from the phenol in the manner described is the kind of material which responds with special aptness to the term "and all resinlike products prepared from phenol."

We think that since the component synthetic resinlike material is made from cyclohexanone, and cyclohexanone is made from cyclohexanol, and the latter is made from phenol, it should necessarily follow that the resinlike product should be regarded as having been "prepared from" phenol within the meaning of the statutory provision. To hold that it was not so prepared because of the intermediate steps in the process of preparation would, we think, be placing an unwarranted restriction upon the term which would lead to an incongruous and erroneous result. Alcohol is prepared, derived, and manufactured from grain as those terms are broadly and commonly understood. Several intermediate steps between the grain and the alcohol are taken before the completed article results, but this fact is no warrant for concluding that alcohol is not "prepared from" grain as that term is commonly understood.

That Congress had in mind making dutiable in paragraph 28 certain resins or resinlike substances which were "prepared from" phenol is clearly indicated by the quoted provisions of the paragraph. There is no showing in this record that any resin may be prepared from phenol except by a process involving different steps, and it certainly is not shown that the resin component at bar can be prepared from phenol by any other method than by the method shown in this record.

In trying to arrive at the right congressional meaning to be attributed to the words "prepared from", we have found no help from the dictionaries or scientific authorities as to the precise term used, and the testimony of the scientific witnesses on the subject is very conflicting and unsatisfactory. No cases in point on the question have been cited by either party to this suit, and we know of none directly in point. The case of *In re Pickhardt & Kuttroff*, T.D. 20728, 1 Treas. Dec. 373, cited by the Government on the meaning to be given the term "derived from", may have some application by analogy only. In that case, the Board of General Appraisers (now the United States Customs Court) construed the term "and dyes derived from alazarin or from anthracin", and held that the merchandise then at bar was derived from alazarin within the meaning

of that term as used by Congress. The Board, in an opinion by General Appraiser Tichenor, there said:

The ordinary and commonly accepted meaning of the words "derived from" is "made or prepared from", "produced from", or "obtained from." The words "dyes derived from anthracin" mean dyes of which anthracin is the source or base. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the extraction of some of its elements and their utilization by actual substitution with other substances. If the manufacturer starts with anthracin, and, by partial replacement or any other process, produces a dye, that dye is *derived* from anthracin, but not otherwise. The interpretation, in this respect, should be similar to that applied to the tariff provision for "preparations of coal tar" (*in re* Roessler & Hasslacher Chemical Company, 49 Fed. Rep., 272; affirmed, 56 Fed. Rep., 481). (Italics quoted.)

We have not overlooked appellant's argument to the effect that Congress in [a] of said paragraph 28 has used the word "prepared", and in [b] has used the term "obtained, derived, or manufactured in whole or in part from", and that in construing somewhat similar tariff enactments the courts have held that by such use of terms Congress meant to distinguish between them and did not use them synonymously. We are cognizant of the fact that our holding here results in giving the same effect to the term "prepared from" as would ordinarily be given if the term "derived from" had been used.

We do not mean to hold that such terms, when found in statutes, are always to be regarded as synonymous. In construing statutes, however, the master rule is to ascertain the legislative intent. *United States* v. *Clay Adams Co., Inc.*, 20 C.C.P.A. (Customs) 285, T.D. 46078. We cannot conclude that Congress, by the use of the two terms under discussion, intended such a result as is contended for here by appellant.

We have in mind the history of the times, prior to and on the date of the enactment of the provisions here under consideration, and what Congress sought to accomplish by the legislation, all of which is so generally known as to require no recital here. It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs. The resin component of the paint at bar is a coal-tar product made from phenol, and no reason has been suggested why it should have

been the policy of the Congress to have excluded the mixture at bar from paragraph 28. No one has suggested any reason for including resin and resinlike products prepared from phenol directly, while at the same time excluding such products when more than one step was required in preparing the same.

Upon the record before us, we do not feel called upon to determine whether or not the merchandise herein involved is described and provided for in paragraph 27 directly.

The imported merchandise is provided for in said paragraph 28, and the United States Customs Court properly *overruled* importer's protests, and its judgment to that effect is *affirmed*.

HATFIELD, Judge, concurs in the conclusion.

DISSENTING OPINION

GARRETT, Judge: I respectfully dissent.

I understand the merchandise as imported is paint which was produced by combining or compounding a number of ingredients. I doubt whether it is a "mixture" in the sense in which that word is used in that portion of paragraph 28 of the Tariff Act of 1922, to which, for convenience, the majority opinion gives the designation "[c]" in its quotation of same. I incline to the belief that it is at least a physical, if not a chemical compound.

But even if it be conceded to be a "mixture", it nevertheless does not, in my opinion, fall within the paragraph where classified by the collector.

As I understand the majority opinion, it holds that while the terms "prepared from", used in one part ([a]) of said paragraph 28, and "obtained, derived, or manufactured in whole or in part from", used in another part ([b]) of the same paragraph, are not always "to be regarded as synonymous", they will be so regarded here largely because of the "history of the times" with reference to the enactment of the customs legislation respecting coal-tar products, dyes, etc., in the Tariff Act of 1922, and the known desire of Congress to give to such merchandise a high degree of protection.

It does not seem to me that the courts are at liberty to assume that the Congress intended that the coal-tar provisions of the act should be subject to any other than the ordinary and usual rules of statutory construction. The paragraphs themselves give their own internal evidences of the care with which they were prepared to accomplish all that Congress desired in respect to the subject matters with which those paragraphs dealt.

But, passing over any question concerning the majority's construction of the words—strained as that construction seems to me to be— I do not believe the involved paints fall within the classification made by the collector, because, as I view it, the "synthetic resin" constitut-

ing only 9.1 per centum of the total product was prepared, not from one of the articles provided for in paragraph 28 of the Tariff Act of 1922, either directly in that paragraph, or indirectly by way of paragraph 27, but from another distinct product not mentioned in either.

As is stated in the majority opinion, in effect, the immediate predecessor of the synthetic resin was cyclohexanone which was made from cyclohexanol, which, in turn, was made from phenol, and, as is pointed out succinctly in the dissenting opinion of Judge Brown of the trial court, phenol, cyclohexanol and cyclohexanone are distinct chemical bodies or compounds, each of which has a distinct chemical formula. When cyclohexanol is made from phenol, the phenol undergoes a complete chemical change, and when cyclohexanone is made from cyclohexanol another complete chemical change takes place. The three things differ chemically and physically. They are distinct products, and the cyclohexanone, the immediate predecessor of the synthetic resin, being an article different chemically and physically from phenol, is not phenol but something else.

It is my opinion that the contention of the appellant should have been sustained, and that the judgment of the trial court should be reversed and the cause remanded.